We've got a lot of lawyers in this one, so five minutes for Mr. Wiener. Yes, Your Honor. Your Honor, I'm Michael Wiener, and I'm speaking on behalf of Officer Khalid Watson. Once an officer has asserted a defense of qualified immunity, the burden is on the plaintiff to prove and overcome that defense. And I'd like to talk about one of the burdens of proof that the plaintiff has. The plaintiff must prove that the unlawfulness of Officer Watson's conduct was clearly established at the time the events occurred. Now, in the context of a Fourth Amendment claim, which we face here, this court has said the clearly established problem turns on the objective legal reasonableness of the officer's action assessed in light of the legal rules that were clearly established at the time the action was taken. Sorry, I don't mean to interrupt, but I know you have limited time. Are we talking about a seizure here or an arrest or a search? What are we talking about? We're talking about the seizure, the unlawful seizure claim. Okay, we're talking about unlawful seizure. Correct. I've watched all the video. Trust me. Which officer, where was Officer Watson in the video? Okay, he's the person with the video. Okay, so he's taking the video. Correct. His role there was he was called in to videotape the incident. All right. And there is an unlawful entry claim and an unlawful seizure claim. The court granted the summary judgment of Officer Watson on the unlawful entry claim, but denied it with respect to the unlawful seizure. Denied with respect to seizure. I got you. Thank you. That's what I'm here to talk about. Okay, good. Currently. And just on that, just because, again, you're not here saying your client had probable cause to arrest. No, Your Honor. I'm not saying that at all. I'm saying that the issue here is whether the plaintiff proved that the conduct was unlawful at the time, clearly proved. And here's the crux of the issue is this, Your Honor. The court defined clearly established at too general of a level. The court cannot do that. The Supreme Court has specifically, excuse me, specifically stated that you cannot define clearly established at a high level of generality because then you miss whether the official acted reasonably in the particular circumstances. You have to drill down to the specific circumstances in order to determine whether he acted reasonably. Okay. But every officer knows you can't arrest, seize a person without probable cause unless you have an exception. So, what did your client think was the exception if there was no probable cause? And this is the issue that the court failed to address as well. No, I'm asking you that question. Yes, Your Honor. What was the exception that he seized? The situation we faced here was that this individual, Mr. Badajar, was also an employee of the police department. And he was ordered to come in for a drug test. And the law does allow the municipality to drug test employees. Yeah, but does it allow them to seize him in his apartment and put him in a police car to take him down to be drug tested? That's a different issue. Well, the question is not whether the law allows that. It's whether the law clearly does not allow that. Okay, put it, then flip it. Same question, but clearly established. Describe any reasonable drug testing, i.e., government employee doesn't have the privacy to prevent that. That actually extends to allow the government to go to their home, seize them, bring them in, and test them. That's my point, Your Honor. No, no, no. I'm asking you for the case. There is no case. Okay, so no case has ever said what your client did is constitutional. Correct, and no case has ever said what my client did is unconstitutional. And that's the issue. The burden is on the plaintiff to show that the conduct was unconstitutional. Right, but the law is clear. Again, your time's short. You have to have a probable cause unless there's an exception. You're saying the exception is drug testing? I'm saying, Your Honor, that yes, in this situation, the municipality can order a drug test. And all my officer did was drive this individual, this employee, to be drug tested. And there's no cases that say you cannot drive an employee to be drug tested. You would have to extend the law. You'd have to take the law on reasonable suspicion drug testing and say, it doesn't apply in a situation where they go to the person's house and order them. Remember, he was placed on the clock by PIB. And PIB is authorized to do that and is allowed to order the drug test of an employee? Look, I think this is a difficult question. I think you have some good arguments. But I don't think one of the good arguments that you have is that merely because they can order a drug test, police can show up and escort him out of his apartment and put him in the back of a car and take him to the station for drug testing. There is no law that supports such a proposition. Your Honor, you have to look at the reasonableness. And the issue is, my client was ordered to do this. OK, well, that's a different issue. Correct. But it's on time. Let me ask you this as your time runs out. But I'll ask you anyway. And you can answer. I understand the order issue is a difficult issue. What does the record reflect about the orders that your client was under when all this took place? The record reflects that my client was ordered to take Mr. Vonderhaar to PIB to be drug tested. OK. And we can look in the record and see that? I mean, I've watched the video. Well, I mean, you see, I've watched the video. I mean, so I'm not sure the video speaks directly to the orders. I can infer what the orders might have been. Well, Lieutenant Williams, who was the person in charge on the scene, tells my client to take Mr. Vonderhaar to PIB. OK, so that's interesting. This is the gentleman who's sort of to the right for the most part in the video, kind of large African-American man wearing a mask. That's the – Well, my client is the one with the video cameras. You don't really see your client. District 3 police officer? I'm not sure which district you're working. You're saying that the lab supervisor is the supervisor of your client? I'm saying that the lab supervisor is a lieutenant who was on scene so that – OK, I guess – and your time is up, but you've got a little rebuttal time. I guess one question. What is your best case authority under orders that your client received, a supervisor's order that justified this wasn't outrageous? What's your best case? That would be the Haney case, Your Honor. And in that case, unless my client had time and a basis to believe that the action was unconstitutional, he is entitled to qualified immunity. And if you look at the video, you can see with all of the surrounding circumstances, which is he witnessed Mr. Vonderhaar being ordered to go to take a drug test. Employment-related. This is not a situation where they just go up to an individual. I think we have your argument. Thank you. You'll be able to stand back up and rebuttal. Mr. Stalbert's attorney is Mr. – is it Alpo? Alpo. Alpo. A-L-P-E-W. OK. Thank you, Your Honor. Ted Alpo for Michael Stalbert. I was going to talk about the video, but I just want to correct one thing. I think there's a misapprehension. So Khalid Watson is the person – you never see him because – He's taken the video. We know who your client is. He's the one who's actually going in the door. OK. We've got that. We've seen the video. So what's the basis for him to enter? What's your – Well, first of all, my comments about the video itself is that the video should be looked at. You knew this case, T.L.A. v. C. Perkins v. Rock, Kyle Hart, which came out on Thursday. It says you looked at the videotape. Yeah, we've looked at it. I know you have. It's cited in everybody's brief. The one person who did look at the videotape, there's no way in the opinion of the judge, district court judge. No, we're going to assume the district court read the – why don't you just make your argument based on the evidence in the video? All right. With regard to Sergeant Stalbert, he – his – first of all, he didn't know anything about a drug test going to take place. The evidence is clear. No one says that you sold this for the purpose of a drug test. He went there to do a wellness test, which he was ordered to do by PIB and by his superior, Captain Hargrove. That's the reason he went there. He went there with Kim Williams, who was his superior officer. They went out there. You've read the briefs. They knocked on the door. He wasn't there. No one answered. So they came back with an officer with a body cam, and they had an EMS around the corner. So he didn't know what was going on. So Stalbert came in. He entered. The reason he entered was first, he thought he had permission to do so. The video – From whom? From Colonel Vonderhaar. Oh, well, the video flatly contradicts that. I just watched it. I understand that. But if you look at the plaintiff's brief in the district court, it really says – Vonderhaar says, okay, in response to Stalbert saying, I'm coming. You really can't hear what's going on there. I'll believe my lying eyes. I want to go put my pants on. And then your client says, and we are coming in. That doesn't sound like consent. I think it's a little bit different in the brief, but I'm not going to make that point. Stalbert also didn't know what was going on inside the apartment, and he was instructed by his superiors that he had to go in there and make sure that his child and the wife were okay, because they didn't know what was going on with Vonderhaar. He was not responsive to anything. He wasn't talking to them. He wouldn't respond. Well, he is talking right there in the door. Right there, finally. But, again, he was – What case do you have if you're not arguing the proposition that was just made, that this was to do a drug test? Your argument is the authority to go into his house. First, you said it was consensual. The second is that he was there for a wellness check? No. He was always there for a wellness check. Okay. And what's your authority that a wellness check allows a police officer to go into the house without anyone displaying imminent danger and injury? And, again, there's no authority regarding wellness checks at all. I don't know of any. We looked all over. I think everybody looked for a case regarding wellness checks. There aren't any. To me, that means you default to regular Fourth Amendment law. That is, the police cannot go in someone's house without probable cause. No. What I'm saying is there were exigent circumstances. It's exigent. But doesn't exigency require an immediate, imminent injury? He doesn't know what's going on in there. He knows there are two other people inside that apartment, and Vonderhaar is standing there, completely door closed, not revealing what's going on. Well, police never know what's going on inside. That's right. That's not a basis to go in. If they have a belief that something's going on. What in the record could support an exigency argument? Pardon? What in the record could support an exigency argument here? Because the video, I will be frank with you, does not support an exigency argument. So, there must be something else in the record that supports it. I think it's more of the information that's not revealed about what's going on. Okay, and what was that? What was that? Well, Vonderhaar was acting erratically. All of a sudden, he cuts off all contact with them at all, and so they didn't know what was going on. How did he sound sickly? No, he wasn't, actually. He has to be. He had to come in and fill out the paperwork to do it. You can't just call up and go on sick leave. He actually wanted to go on leave without pay, which is not sick leave. It's a totally different thing. He wanted to be on leave without pay. To do that, you have to come in and fill out the paperwork, which he said a couple times, well, I'm going to do that, I'm going to do that, and he didn't do it. So, sick leave and leave without pay are two totally different concepts. Sounds like he might be disciplined. Doesn't sound like he can go into his house. Well, that's the other thing entirely, but they didn't know what was going on. Again, it's checking on our blood. I have just one question, the same question as to counsel before you. When you say he was ordered to, who was the super – what does the record say as to the person who ordered him to? When was the order made and who made it? They ordered him to go do the wellness check himself. There were a couple of people. Yes, Sabrina Richardson did it. Who was the primary direct supervisor of his that ordered him to go into the – Simon Hargrove. Okay. Was that day of and was he present? No, he was not present. I think that was that morning. Yeah. That day, but he was not present at that at all. Okay. Thank you, counsel. Thank God. Good afternoon, Your Honors. My name is Paul Mitchell, and I'm here on behalf of Kim Williams, Lieutenant Kim Williams of the case. I guess with much discussion already, I can see to your question. Yeah. Well, no, you've heard our questions. Is your primary argument as to the authority to go – actually, the only claim against her that's before us is, does she have qualified immunity against the arrest? Is that correct? The seizure? Yes, Your Honor. So what was – there was no probable cause, correct? No, Your Honor. We would also contest that the encounter was rather consensual. You all may disagree in that the circumstances did not ripen this encounter from a consensual encounter to what would amount to be a seizure. He consented to go in to PIB? Did he ever consent? I don't think he ever did not consent or give any aggressive assertion. Let me just be frank because you have to – I watched the video. I'm going to believe my lying eyes over what you say because I saw on the video, this guy had no choice. There were three uniformed police officers right there with the full regalia and the guns and everything saying, you're coming with us to PIB. Yes, Your Honor. I get it. I wouldn't have felt free to leave. He didn't feel free to leave. It was a seizure. So the question is, what's the authority for seizing him? So ultimately, with that said, first I would like to point to the order and the reasons in quoting the disrecording that my client's backup rule emerged after other officers who were just named Captain Simon Hargrove and ultimately Lieutenant Daryl Watson of the Public Integrity Bureau directed both the wellness check and the drug testing. At that point, I think the burden-shifting analysis places the burden on the respondent, not only to point to clearly established law, which I think Your Honors have already addressed in the prior arguments, but then also to a reasonableness standard. I apologize. So we need to find an order by a superior. This is what Judge Higginson was asking earlier. Where do we look in the record for the evidence that shows Lieutenant Williams here, your client, was acting on orders from a superior? Hargrove? Cosgrove? What was it? Hargrove. Hargrove. Okay. Is that where we're going to find the record? And if so, what is the record going to tell us? Well, the orders of Captain Simon Hargrove were to perform the wellness check, which I think is the basis of the entire encounter as it is. The encounter matriculated from a wellness check to performing a drug test upon communication with Lieutenant Daryl Watson. She's on the phone. Is that when she's on the phone? Correct. Correct, Your Honor. My client was instructed to contact Daryl Watson upon making contact with the respondent. When that happened, she received the orders to perform the drug test and came out and then relayed those orders and then allowed Daryl Watson himself the opportunity to relay those orders personally through the speakerphone conversation. So Watson on the phone with her. He is her superior. Absolutely. And as a lieutenant with the Public Integrity Bureau, he does have the authority to... But a wellness check, you would agree, doesn't give you authority to arrest someone. It is to check on their wellness. Absolutely, Your Honor. And what's the authority to arrest? You think it was consent? The authority to arrest, I don't... And ultimately, look, it's Your Honor's opinion that there was necessarily no authority to arrest based on the drug test. So I think at that point, the burden does shift or the analysis shifts to whether our clients and my clients specifically acted reasonably in doing so. And we believe that... All I'm saying, to be clear, all I'm saying is my view of the video is that the gentleman, Vanderhaar, was seized. That seems obvious to me. Right. Maybe on further reflection, I'll decide he wasn't. But I'm just telling you what I'm looking at. Right, right. And so the question then becomes, all right, what's the authority to do that? And you're saying an order, a wellness check, drug test, okay. Right. And so ultimately, the issue of the seizure, I think, was addressed in the order to... And in Darrell Watson's words, he needs to come to PIB, he needs to take the drug test. At that point, my client acted reasonably. Your client interpreted that as bring him in. Absolutely. And I believe they did so reasonably. Now, is the best authority... Your Honor, do you have any different authority other than the Heaney case? I think the Heaney case is directly on point. That supervisor was there assessing all factors, correct? Unlike here. Unlike here as far as a physical presence, Your Honor, but... Just being able to confirm if there was consent or this supervisor clearly wasn't present. Sure. And even if Heaney is applicable, correct me if I'm wrong, but that law says, not if the order is facially outrageous, correct? Yes. Okay. And so your argument here is what? That it's not facially outrageous to arrest someone if you want to bring them in to drug test them? Yes, Your Honor. And again, we disagree with the terminology of arrest, but certainly that it was reasonable... Anderhart was not free to go. Sounds like an arrest. Yes or no? I would say no, Your Honor. You would say no? I would say no. You would say no, he was free to go? Absolutely, and it was testified by my client and ultimately I think the other co-defendants as well, that if he ever made an assertion and said, I would like to leave, I would like to go back inside, he would have been allowed to do so. He was not physically restrained. He had to go back inside and get his phone, and someone said, no, you can't even do that. And even the issue with the cell phone, I think what's missed in that concept is the cell phone was on its way back to the respondent at that exact moment. Michael Staubert was actually transferring the phone from the apartment back to the patrol car, and he was back in possession of the phone. You've been kind to give us more answers, but you will have rebuttal time. Thank you. Let's hear from Mr. Anderhart's attorney, Mr. Mayberry, correct? Or no? That's correct. Okay, Pugh. Good morning, Your Honors, and may it please the Court. My name is Andrew Mayberry, and I, on behalf of my co-counsel, Glen McGovern, and Ms. Callan-Jones, have the pleasure of representing Mr. Vonderhaar. You've just heard oral argument on the issue of qualified immunity. I'd like to take a step back from that, if you'll divulge with me, and look at some jurisdictional questions that have arisen. Particularly going straight to the point is this idea of pendent appellate jurisdiction, which the Fifth Circuit has recognized. Pendent party? Pendent appellate. Pendent party, though. Is that what you're arguing? No, I'm saying that this Court can exercise pendent appellate jurisdiction. Yeah, but over a pardon. If you look at the orders that are not properly before the Court, relative to the ones that are appropriate before the Court. Because when you look at that, one thing that the Court considers is, would review of the unappealable orders provide a meaningful review of the ones that are appealable, which goes to this qualified immunity aspect. This is speaking to the city and to Ferguson? To both the city as well as the ones with qualified immunity. The idea of it all relating to summary judgment because. . . Oh, even the grant of qualified immunity to Watson? I vote to all three. And just, again, bear with me here, because where it starts is you look at what is unappealable. There's one of our unappealable orders that is an evidentiary ruling by the was incorrect. But you're acknowledging you can't appeal that? Correct. But with pendent appellate jurisdiction, you have the ability to look at those and see how those evidentiary rulings burdened the ultimate summary judgment record. Because if there's an evidentiary problem and it is substantial and this Court agrees with it, then that effectively questions what information the district court had at the time it made its rulings on both qualified immunity summary judgment as well as the Monell analysis. Just because you only have ten minutes and there's some tricky questions about some of the law you heard us asking them about? Sure. I mean, I understand you're claiming multiple issues are before us, maybe, may not. We'll probably figure that out or my colleagues will have questions. But what's your response to the fact that many, if not all of the defendants were acting under order? That's where an important distinguishing comes in, in the qualified immunity analysis. They were under order for employment purposes. This wasn't related to something going on in the community. They interacted. They initiated this wellness check specifically for some employment issues that were going on, bringing into the drug test, which to be completely honest, the drug test wasn't even properly ordered under NOPD policy. So that is an issue in and of itself. But we're looking at the subjective intentions for a while there and not backing out and looking at it from an objective standpoint. Objectively, three armed officers showed up at a private citizen's house, opened the door saying that they wanted to check in. They checked in. They still furthered that, then went inside the house. Once they got inside, they forced him to come with them to do, again, a drug test that wasn't properly requested and seized him in the manor. On Stalbert's entry into the house, the district court said there are disputes of fact. Is the dispute favoring them, that he does say, okay, I want to put my pants on? I think the dispute's favoring us because he went. Is that the extent to which there is a dispute? In relation to the claim applicable to Stalbert. Yes. One of the other orders we have on appeal looks at Watson going into the house, the one that was just there to film. He says he was just abiding by his orders, which were there to be the cameraman. But we've filed an appeal, which is not probably the court. But again, appended appellate jurisdiction allows a holistic review to make sure that the evidentiary burdens that the trial court caused didn't inflict. If the child or the girlfriend had been screaming, you would agree that there would be, let's call it, just an exigent circumstances exception. I can't say I would because even if that concern came up, you don't have to cross the threshold into his home to check the kid. The kid was sitting there on the couch under a cover. The girlfriend was in the back room. The girlfriend was in the back room. But if the kid's screaming. The police officer can go in. But would she be screaming? Again, those are when the circumstance comes in and you see what was before the summary judgment record in order to make that assessment. And based on the record that we have, there's potentially problems that that record was not as updated and sufficient with facts that would help the summary judgment analysis. So would you agree that the issue that's presented to us, the difficult one, isn't exigency, isn't wellness. It's whether these officers being lower level reasonably followed orders that may turn out to be wrong but aren't outrageously wrong. To an extent, you have to first consider, again, and I keep going back to these evidentiary issues because there's a second issue that is in play regarding a pending motion that was never even heard. The magistrate set a hearing for this. That hearing never took place because the summary judgment rulings were made by the district court. Okay, I'm not phrasing my questions correctly. What is your understanding about police officers who violate the Fourth Amendment but they were ordered to do so? When does that still allow them to have qualified immunity? Forget the facts of this case. Just describe the law. When the orders are applicable to what they can do as law enforcement officers, not any kind of level of employment between the person that they're interacting with and where they are at that moment. Objectively, law enforcement officers were engaging in a wellness check, which is what Chief Ferguson has said happens on a daily basis. That is something they know within their police parameters. This employment issue is looking into why they were there, and why they were there was not because of a law enforcement issue. It was because of some unrelated drug matters. Do we have a clear record in this appeal, as it appears in front of us, as to what the officers were doing there? What orders were they acting pursuant to? I do not believe you do. Expert testimony. I agree with Judge Higginson that the difficult issue here is whether the officers are acting under orders, and if so, are they acting under orders that are facially outrageous. And to adequately approach that assessment and look into the record, you want to ensure that the record is complete with all potential evidence that could help guide you in making that determination. There are two very important relevant pieces of evidence that was either What are those? There is the expert report. So the city filed a motion in Lemonnier to have our expert excluded. The district court's order clearly signified that he considered evidence in choosing to exclude the expert when that evidence was not at all utilized by the expert in his opinion or any party in the pleadings. The second thing is, again, there was a pending motion for Lee to amend our complaint because we had just recently had the opportunity to depose Chief Ferguson. That presented newly discoverable evidence that related both to the summary judgment analysis of qualified immunity and the summary judgment analysis of Manel. Okay. I hear what you're saying. The orders, at least insofar as we've discussed them in oral argument, I've heard that orders came from Hargrove and Watson, Simon Hargrove and Daryl Watson. Is that right? Okay. Is there evidence in the record with respect to those two gentlemen about what were they ordering and why? I can't say that there is because what they were ordering wasn't proper. Okay. I mean, I can't know. I mean, if we have to decide qualified immunity on the basis of whether orders were facially outrageous or not, if I don't know what the orders were, I don't see. I could decide that. And choosing to decide that one looks to the evidence in this regard, specifically an expert and what an expert says, these standards are for what is considered an acceptable order. We don't know because that didn't happen at the district court level. And if we're trying to assess whether the record did or did not establish genuine facts, we need the evidence to know what those facts may or may not be. In your opinion, did Defendant Watson seize your client? Defendant Watson? Absolutely. When? When? When? At the time, you could consider it when they had him outside after they had gotten him out of the house because that's when he was asking about whether he had to go and if he didn't go, his job would be in jeopardy. That implicates all three of them because then you're standing in front of three police officers. Do you have the feeling that you can leave in that instance? I don't think so. If that's not to be considered, you can certainly further that when they get to the cop car because Williams, who's right next to Watson, says they're not handcuffing him as a courtesy and that he's not getting his phone back. At that point, Watson pats him down and puts him in the vehicle. And what about their answer that you haven't identified clearly established law in this context? In this context, during employment issues during a wellness check, certainly not. Because again, you look at the subjective intention and not include that in ancillary judgment analysis. There is law that establishes Fourth Amendment protections for employees are still in existence, particularly when you're in your home off the clock enjoying every reasonable expectation of privacy you have in your home. That reminds me, when you say off the clock, what was his legal status at home? He was on unpaid leave. Unpaid leave, which he had requested and they approved. I don't know what the process of approval was, but Stauber was aware that he was off duty, not on the clock and on unpaid leave. It was not any kind of, he was taking these days for himself based on the underlying circumstances of what caused him to request that leave. Who gave the order to do this? To do what? To do what they did. I think they just unilaterally decided it based on his complaint of the lab. Who was they? That would be Sergeant Stauber as the supervisor of the lab. I believe that would be Hargrove because he was also. The lab's not going to be directing officers to go out to places. But therein lies the problem because they did. They took that action and this all really boils down to there being no written policy for the wellness check. If there would, there would be instruction on who can give those orders. When you don't have a policy in place detailing how to go about this, then you are allowing your officers to operate at their own devices. The policy itself. What's the policy itself? I said that is, you're describing a policy, but it's a policy of non-enforcement. What are we trying to get at? Again, I'm not understanding. I've heard of probable cause. I've heard of Terry stops. I have never heard of a wellness check arrest. I've just never heard of it. And it's because it doesn't happen. And when wellness checks happen, you're doing them for someone that was involved in the community. Someone's contacting law enforcement and asking for that to be done. I've heard of exigent circumstances as well, as what Jim Dickinson was asking. If a woman was screaming in a house or a child was screaming and the officers had the reason to go in there to make sure no one was in danger, I've heard of that one too. And so when there is no screaming and you can observe from the outside of the home that there is no exigent circumstances, therein lies your clearly established law. Thank you, counsel. Thank you. Oh, right. Ms. Robbins for the city. Good afternoon, your honors. Elizabeth Robbins on behalf of the city through mayor Cantrell and former NOPD superintendent, Sean Ferguson. I want to start by expressing some important issues raised by the district court on November 3rd, a year ago when he had his final pretrial conference and made his ruling on these motions for summary judgment, specifically as to the limited right of appeal on motions for summary judgment. And what he said was this, appeals to the fifth circuit of motions for summary judgment to his understanding are limited to officers appealing a denied motion for summary judgment on the subject of qualified immunity. In fact, after he made this ruling at that hearing, pretrial hearing, he asked each of the defendant counsel to verbalize, are you going to file an appeal of any portion of the motion summary judgment on qualified immunity that was denied? And they each stood up and said, yes. And then he took it a step further. He said, I realize trial's upon us. And normally you would file an appeal of my written ruling. We don't have time for that. If you're going to act on these appeals of the motions for summary judgment or portions thereof as to qualified immunity, I need you to file that tomorrow on Friday, November 4th. And they all did that. The ruling itself for the things that the court said on November 3rd, wasn't actually written. It's document 250 in the record. It wasn't actually written until the 14th, which was the day trial was going to take place. Help me understand. What's the point of this? Pardon? Just jump ahead to what the point of that. So the point of this is that this court doesn't have jurisdiction over the jurisdiction that your court granted on plaintiff's claims of municipal liability against the city of New Orleans and city defendants. Grant of summary judgment. You know, typically we don't have, if it doesn't dispose of the entire case, we don't have jurisdiction. Correct. Correct. Same for qualified immunity, right? Pardon? Same for qualified immunity. The grant of qualified immunity isn't immediately appealable. You're correct. Even if there wasn't a special exception for qualified immunity MSJs, there is the fact that if it doesn't dispose of everything, it's not appealable. And the judgment that the district court granted on the city's motion for summary judgment on qualified, I mean on municipal liability was not a final judgment. The plaintiff also had state law claims against the officers in the city. And there was another officer, Daryl Watson, who the city in its motion for summary judgment didn't even address him. So that's completely unresolved. And the plaintiff acknowledges this, but what plaintiff recommends in their petition is that this court stay these appellate proceedings and allow time for the plaintiff to go back to the district court to certify, at least as the city, the motion for summary judgment on municipal liability. I disagree with that recommendation that the motion was already made to the 5th of this year. So plaintiff themselves has acknowledged until that happens, this is not a final judgment. It's not appealable. I, you know, I'm not sure if the court has any particular questions, but I would like to ask to the substance of the, if this court were to entertain the plaintiff's appeal of the grant of motion for summary judgment to the city, but I do want to address something that's been mentioned a couple of times by plaintiff's counsel is that if they had just gotten this second amended complaint in, the court would have had some, some information particularly as to their ability to defeat the municipal liability claim. And I disagree. I don't think the argument has merit. Furthermore, it's grossly untimely pursuant to the court scheduling order, the court scheduling order for this November 22 trial set a deadline of January 14th of 2022 for any party to file an amended pleadings. There were extensions to various deadlines throughout this particular as to discovery, but that deadline was never extended or changed. So when the plaintiff filed a motion for leave to file a second amended complaint on October 17th, that was the same day they filed an opposition to the city's motion for summary judgment on municipal liability. It was over nine months after the deadline established by the court had ever passed. What's up? Pardon? Anything happening in the district court right now with respect to this case? No, everything is, is stayed there. But what I did want to mention is since plaintiff's counsel mentioned if they had just been able to file this and the court could have addressed this, it would have come out differently. The fact is that the court did address this. The court saw the motion for leave to file a second amended complaint, read that and address the issue about a policy and whether or not training was done and found those claims that would have been brought up to the second amended complaint insufficient. I also want to kind of address the elephant in the room as to this whole thing about a wellness policy or a check on that. It just needs to be said, NOPD wasn't being deliberately indifferent and there doesn't need to be a policy on wellness checks and how to perform them. We don't have to give officers policies for every possible circumstance that puts them at a citizen's door. What we do give them. I hear what you're saying, but all I'm concerned about is I watch a video and I see officers saying we're performing a wellness check and we're coming in. I mean, that's not, not in America. I don't disagree. Maybe in some other country, but in America you don't do that. I don't disagree, Your Honor, but I think the point as far as the city and the municipal liability is that the NOPD had policies on search and seizure wherever that might occur. And as you guys have already mentioned, probable cause, exigent circumstances or consent. So you're saying there was no policy telling police officers to go in without those? That's correct, but not under. There's no wellness policy. There's no wellness policy, but you don't need that because there's a search and seizure policy and it tells you you can only go in under these circumstances and they're trained on that. So my main position is that there's no basis, there's no jurisdiction of this honorable court on the grant of municipal liability to the city. And I ask that that be affirmed. Thank you, counsel. Okay. Probably have two, two and one rebuttal. Yeah. Your Honors, very quickly. The issue with the three Unifor police officers, uh, seizing Mr. Vonderhaar, it has to be understood that two of those police officers were his supervisors. He knew them. These were people he worked with. And what do they dress like when they go to work? Exactly like they were dressed like when he saw them on that day. This is not just some individual who is not familiar with police officers or how they look or how they dress. Secondly, Your Honors, when you talk about qualified immunity, it's a two part test, whether there was a violation of the law. And even if there was a violation, that's not enough for to deny qualified immunity. You have to look at the reasonableness of the standard. I mean, the objectively reasonableness of the actions and the actions of my client, Officer Watson, were objectively reasonable. He was told by his supervisor, Lieutenant Hayes, to go videotape the incident. That's what he was doing. So when Sergeant Stahl made the decision to go into the apartment, my client was, what does he do? Does he stay outside? No, he goes in because he was told to videotape it. So he went in to videotape it. Then they're outside talking to Mr. Vonderhaar. The question then is he's ordered to take Mr. Vonderhaar to the department, PIB for a drug test. He doesn't grab him. He doesn't force him. He doesn't do anything but direct him to where his car is. If you think that's a seizure, that doesn't end the qualified immunity issue. There still has to be objective reasonableness standard to apply. And if you look at the situation, my client heard the testimony of Lieutenant Watson say you are on the clock, you are ordered to take a drug test. If you look at the employment-related constitutional violations, you are allowed to drug test employees. It changes the whole thing from whether they are just an individual citizen or you have to do a balancing test. You have to balance their constitutional rights against the rights of the employer when there's an employment issue. So it does change. Thank you. Thank you, counsel. Good afternoon. I'd like to address a couple of things. First off, the question was asked where in the record are the instructions given regarding this drug test. They are in the deposition of Michael Stalbert. He talks about one. After the first wellness check he made the day before, he goes over to PIB. He happens to be there on unrelated business. And he asks the commander of PIB, happens to be in Richardson. And they're talking about it. And she calls in Lieutenant Watson because he just had a similar experience. And what he instructed them to do, along with Sergeant John Helu, was you have to go inside, not only make sure he's okay, but make sure everybody else in there is okay because we don't know what's going on. Those are the instructions Sergeant Stalbert had from his superiors at PIB. And PIB, they're over everything real tightly. So then, that night, the afternoon before he had gone back, he'd done a wellness check, and then they couldn't find nothing for Stalbert. So he and Hargrove stayed up until 10 o'clock at night trying to call him, trying to contact him, trying to text him. And they heard nothing. The next day, Stalbert went over there by himself again, no response from the apartment. And then that's when the decision was made to send Kim Williams with him, and there was no response. And they went ahead and got an officer with a body-worn camera. And so that's how Cleve Watson got involved because they figured we'd better videotape this, and they called for an ambulance. And that's how it all came down. You have three separate attempts to do a wellness check on a guy. Finally, we got a response. And you have the deal where you have a body-worn camera now for this third one, and you have the ambulance out there to gauge something's wrong. This was not a pretense. Stalbert, that's why he had no idea that they were going to drug test him. All he knew, all he was told to do was find out if Bonhart was okay and everybody in the house was okay. And that's what he did. Now, did he go in the door? Yeah, he did. If Bonhart had opened the door, he wouldn't have had to walk in. Thank you, Counsel. And one minute for Mr. Mitchell. Yes, Your Honors, and thank you for the opportunity of hearing this today. First, I would like to point to the decisions at the encounter were ultimately not unilateral between the three co-defendants that were just established in the order and reasons that the wellness check was not originated by Kim Williams or the other co-defendants and that ultimately they were just following orders. I want to stress, again, the employee-employer relationship and the supervisory nature of this relationship. It gets muddied that our clients, as law enforcement officers, presented somewhat of a threat. However, the nature of this employment and to be working for the police department and for police officers, I think, needs to be taken into account to lessen, I think, the severity and the formality that may show at the surface. Finally, this court affords ample protections of qualified immunity to all but the plainly incompetent or those who knowingly violate the law. My client acted in good faith and reasonably in following the orders of her superiors in performing the wellness check and the drug test, and in that sense should be afforded qualified immunity. Thanks. Thank you. The case is submitted. We have one final case for the day, 22-508-72, United States v. Malmquist.